AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>iPhone model 13 A2631 | ) ) ) ) ) ) | Case No.   26mj2582 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-1, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. s. 1956, 1957 | Money Laundering and Conspiracy to Commit Same |

The application is based on these facts:

See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Travis Womack*

*Applicant's signature*

Travis Womack, FBI Task Force Officer

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date:   04/28/2026

*Judge's signature*

City and state:   San Diego, California          Hon. Michael S. Berg, United States Magistrate Judge

*Printed name and title*

## ATTACHMENT A-1

### PROPERTY TO BE SEARCHED

The following property to be searched:

1.  A cellular phone, an Apple iPhone model 13 A2631, seized from Alex Nevarez on April 20, 2026 (**Subject Phone 1**);

**Subject Phone 1** is currently in law enforcement possession in the Southern District of California.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephones described in Attachments A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephones for evidence described below.  The seizure and search of the cellular/mobile telephones shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephones will be electronic records, communications, and data such as emails, text messages, chats, geolocation information, and chat logs from various third-party applications, photographs, audio files, videos, and location data from January 1, 2026, up to and including April 20, 2026:

a.      tending to indicate the source of funds involved efforts to launder money or the operation of an unlicensed money transmitting business;

b.      tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers – used to facilitate or discuss money laundering or the operation of an unlicensed money transmitting business;

c.      tending to identify co-conspirators, criminal associates, or others involved (including communications amongst these individuals) in money laundering or the operation of an unlicensed money transmitting business;

d.      tending to identify travel to or presence at locations involved in money laundering or the operation of an unlicensed money transmitting business;

e.      tending to identify the user of, or persons with control over or access to, the **Subject Phones**; and/or;

f.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

Which all are evidence of violations of Title 18, U.S.C., Secs. 1956, 1957 (money laundering and conspiracy to commit same).

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS**

I, Travis Womack, a Task Force Officer (TFO) assigned to and cross sworn with the Federal Bureau of Investigation (FBI), having been duly sworn, depose and state as follows:

**INTRODUCTION**

1. This affidavit supports applications for warrants to search the following electronic device:

a. A cellular phone, an Apple iPhone model 13 A2631, seized from Alex Nevarez on April 20, 2026 (hereinafter **Subject Phone 1**);

b. A cellular phone, Motorola Moto G, seized from Alex Nevarez on April 20, 2026 (hereinafter **Subject Phone 2**);

collectively the "**Subject Phones**," which are both currently located in the Southern District of California.

2. The California Highway Patrol (CHP) seized the **Subject Phones** on April 20, 2026, from Alex Nevarez incident to his arrest by California Highway Patrol after a large amount of bulk cash was found during a traffic stop on a rental vehicle Nevarez was driving. The evidence, which includes Nevarez's statements, and the manner in which the cash was packaged and being transported, shows that there is probable cause to believe Nevarez was engaging in violations of Title 18, U.S.C., Secs. 1956, 1957 (money laundering and conspiracy to commit same), hereinafter the Target Offenses.

3. Based on my training and experience, and the facts as set forth in this affidavit, I submit that there is probable cause to believe that violations of the Target Offenses have been committed by Nevarez. There is also probable cause to believe that a search of the **Subject Phones** as described in Attachments A-1 and A-2 will produce evidence, intelligence, and/or instrumentalities of the aforementioned crimes, as described in Attachment B.

4. The information set forth in this affidavit is based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents related to

this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of obtaining a search warrant for the **Subject Phones**, it does not set forth each and every fact that I or others have learned during the course of this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5.    I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  I have been assigned as a TFO with the Federal Bureau of Investigation (FBI) since April 2024 and have been a Deputy with the San Diego Sheriff's Office (SDSO) since 2008.  I am presently assigned to the San Diego FBI's HSTF Strike Force. The Strike Force investigates drug trafficking and related offenses, including the laundering narcotics proceeds by major drug traffickers and drug cartels in Mexico, Central America, and South America.

6.    Prior to my assignment with the FBI at the HSTF Strike Force, I was assigned to the San Diego Law Enforcement Coordination Center (SD-LECC) Tips and Leads Unit. where I would vet and investigate Suspicious Activity Reports (SAR) that were submitted to a public facing website.  Prior to that I was assigned to the Vista Community Oriented Policing and Problem Solving (COPPS) Unit where we would address quality of life issues in the City of Vista.   Prior to that I worked as a patrol Deputy at the Vista, Rancho San Diego and Lemon Grove stations.  My first assignment with SDSO was as a Detentions Deputy at the San Diego Central Jail (SDCJ).

7.    In my law enforcement career, I have been involved with multiple investigations targeting money laundering organizations and their individual conspirators. I have received formal and on the job training in transnational organized crime and money laundering techniques utilized by Drug Trafficking Organizations ("DTOs").  I have

received formal training in "Digital Currency Investigation". I have participated in investigations in which drug traffickers and money launderers relied heavily upon telephone communication to include the use of end-to-end encrypted messaging applications such as WhatsApp, e-mail services, and cellular phones to communicate with associates and co-conspirators. Through my investigations, my training and experience, and discussions with other law enforcement personnel, I have become familiar with the tactics and methods used by criminal organizations to smuggle and safeguard controlled substances, to distribute controlled substances, to collect and launder the proceeds from the sale of controlled substances and the clandestine manufacturing of narcotics.

8. Specifically, I have learned that money launderers often require the use of one or more cellular phones to negotiate times, places, schemes, and manners for laundering illicit funds. I also have learned that professional money launderers depend upon cellular phones to maintain and store their extensive contacts. The use of cellular phones is essential in maintaining timely long-distance and local contacts with other co-conspirators, which money launderers employ to receive illicit funds and launder them through the typical steps of placement, layering, and integration. These money launderers heavily rely on encrypted messaging applications as well as e-mail services to communicate and transfer information and documents. Cellular phone applications such as cryptocurrency wallets, peer-to-peer payment applications, or online bank account applications also allow subjects to conduct money laundering transactions from their cellular phone(s).

9. Based upon my training and experience as a law enforcement officer, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following

a. Money launderers will use cellular/mobile telephones because they are mobile, and they have instant access to telephone calls, text, web, and voice messages.

b. Money launderers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal activity while the crime is in progress.

3

c.    Money launderers will use cellular/mobile telephones because they often rely on encrypted messaging applications to both conceal their communications from law enforcement and to easily communicate with co-conspirators who are overseas.

d.    Money launderers will use cellular/mobile telephones to easily transfer documents and media inherent to money laundering activities to include banking documents, wire transfer instructions and confirmations, deposit slips, photographs of account balances and statuses, and the contact information of co-conspirators.

e.    Money launders will utilize applications installed on their cellular/mobile telephones such as cryptocurrency wallets, peer-to-peer payment applications, or online bank account applications to conduct money laundering transactions.

f.    The use of cellular telephones by money launderers and their co-conspirators tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

10.    Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists, and stored text messages. Much of the evidence generated by a money launderer's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

**FACTS SUPPORTING PROBABLE CAUSE**

11.    On April 20, 2026, at approximately 1:04pm, a California Highway Patrol Officer was on duty driving a fully marked CHP patrol vehicle and in full uniform. The Officer was driving southbound on I-5 adjacent to Basilone Road in unincorporated San Diego County. He observed a blue Toyota Camry with CA license plate 9RKC384 traveling less than one car length behind another vehicle at 55 mph which was a violation of California Vehicle Code 21703 (following too close). The Officer conducted an enforcement stop of the Toyota Camry and contacted the driver and sole occupant who was

4

identified by his California license as Alex Nevarez.  Nevarez yielded and stopped in a parking lot adjacent to the San Diego County weigh station.

12.    Nevarez provided the Officer with the rental agreement for the Camry via one of the **Subject Phones**.  Nevarez stated that he was coming from Los Angeles and driving to San Diego to see family.  Nevarez was having difficulties answering questions in English, so another CHP Officer arrived to assist with Spanish translation.  Nevarez said he was driving to an "In and Out" restaurant in National City, CA to meet his family.  He related that he was planning on spending the night in San Diego with his family, however there was no luggage visible in the vehicle for an overnight trip.  When questioned about the lack of luggage or toiletries, Nevarez responded that he was going to wear the same clothes the following day on the return trip home.  At approximately 1:25pm, based on the contacting officers' observations that Nevarez appeared nervous and presented an improbable travel plan, he was presented a written consent to search form in Spanish.  Nevarez read the form in its entirety and signed the form granting written consent to search the Toyota Camry.

13.    CHP Officers deployed a K-9 unit to conduct an exterior sniff of the vehicle after Nevarez signed the consent to search. The K-9, who was trained to alert to the scent of narcotics, alerted to the right rear passenger door seam.  Following the K-9 alert, Nevarez was asked if there were any illegal narcotics or large amounts of currency in the vehicle. Nevarez responded that he had approximately $200,000 in currency on the right rear floorboard of the vehicle.  He explained that the currency was from his business, and that he was taking it to his family in San Diego.  He could not clearly explain what his business was, but described the cash in his vehicle as proceeds from a restaurant investment.

14.    Based on the certified K-9 alert, Nevarez's statements, and the signed consent to search form, CHP Officers conducted a search of the Toyota Camry and located a large amount of bulk cash US currency (the "subject funds") located on the right rear floorboard of the vehicle where the K-9 unit had alerted. The subject funds were located inside of a backpack and a double-bagged paper grocery bag on the right rear passenger floorboard. The entirety of the subject funds were composed of bundles of cash in mixed denominations

5

bound with elastic bands. The cash inside of the backpack was in loose bundles. The remaining bundles of cash inside of the paper grocery bags were sealed inside of plastic "food saver" type vacuum sealable plastic packaging. A photograph of the cash and its packaging are depicted below in Exhibit 1. Based on their training and experience, the Officers suspected the currency was the direct proceeds of illegal drug sales. CHP Officers placed Nevarez under arrest for violating 11370.6 of the California Health and Safety Code (possession of money or negotiable instruments in excess of $100,000 obtained from the sale of narcotics).

Exhibit 1: Disposition of the Subject Funds Seized from NEVAREZ's Vehicle



15.    Following his arrest, Nevarez was detained and walked a short distance to the San Diego County Weigh Station for processing and interview. A CHP Officer assigned as a Task Force Officer with the FBI, two other FBI Agents, and I interviewed Nevarez. Two cell phones (the **Subject Phones**) were found in the cabin of the Toyota Camry, and

Nevarez later signed a property slip for the **Subject Phones**. As explained below, Nevarez used **Subject Phone 1** to place a call to an associate whom he identified as a fellow "investor." The subject funds and **Subject Phones** were seized and transferred to the FBI.

16.     Nevarez was verbally advised of his *Miranda* rights, he stated he understood the rights and elected to continue speaking to the interviewing officers. Nevarez subsequently provided extensive statements to the interviewing officers. To summarize, Nevarez stated that he earned a living engaging in three jobs: flipping houses, investing in restaurants, and conducting investment trades (foreign currency trading, cryptocurrency, and stocks). The subject funds found in his vehicle were proceeds from these jobs and investments. Nevarez stated that $50,000 of the subject funds belonged to him, and the remaining funds belonged to other "investors," but Nevarez declined to provide their names. Nevarez did not know how much money he had that belonged to the other investors, but that the total amount of cash in his possession was more than $200,000. Nevarez explained that he was enroute to an "In-and-Out" restaurant to meet an "investor," and potentially provide a portion of the subject funds to this person after they had a business discussion. Nevarez declined to provide the name of this investor to the interviewers. Of note, this narrative differed from his earlier statements to the officers at the traffic stop, wherein Nevarez stated he was enroute to meet his family at the "In-and-Out" restaurant.

17.     The interviewing agents and TFO pressed Nevarez for basic information about his "jobs," and Nevarez provided answers that were vague, demonstrably false, or in which he claimed not to know the information at all. For example:

a.     Nevarez claimed that a portion of the subject funds were from a restaurant that he had invested in called "Saca La Bolsita," located in Long Beach, CA. Nevarez had been to the restaurant in person. However, when Nevarez was asked to provide the address or street that the restaurant was located on, he was unable to. One of the interviewing agents provided Nevarez access to a Google Maps application, and Nevarez was unable to locate the restaurant. In fact, open source research shows that no restaurant by this name exists in Long Beach, CA, or anywhere in the United States. Nevarez only

7

claimed to know the first name of the restaurant owner, and that he did not have his phone number.

b.    Nevarez claimed that a portion of the subject funds were from a home renovation in Riverside, CA that he invested in. Nevarez was unable to provide the address of the home.

c.    In terms of his "investments" and trading activity, Nevarez spoke only vaguely of the types of investments he conducted. Nevarez said that he typically invested in Euros and "a little bit of crypto." Nevarez discussed several internet trading platforms that he used to include "Binance" and "Fchoice" (possibly referring to "FXChoice"). However, your affiant notes that these online trading/investment platforms do not use or dispense cash proceeds.  When pressed to provide an example of a specific trade that he conducted that explained the bulk cash proceeds, he prevaricated, first stating that he could find the information in one of the **Subject Phones**, but then clarified that "the thing is, that can't be verified with a specific trade."

18.    At time of writing, the subject funds have not been counted, but are estimated to total approximately $250,000.

Evidence Specific to the <strong>Subject Phones</strong>

19.    Throughout the interview, when the interviewers asked Nevarez specific questions about the source of the funds or whether he had documentation that could corroborate his claims, Nevarez repeatedly deferred and stated that he wished to make a phone call to a "friend" who would provide all the answers that the interviewers were seeking.  Nevarez said that this friend was another investor who was going to explain where the funds were from.

20.    Nevarez agreed to make the phone call to his "friend" in the presence of the interviewers and agreed to make the call with the understanding that the call would be recorded.  Nevarez was allowed to access **Subject Phone 1**, and he placed a phone call to the contact "Malacon." "Malacon" had a Mexico phone number. Nevarez explained to "Malacon" that he was being questioned by the California Highway Patrol about the cash

8

in his vehicle. Nevarez advised "Malacon" that there was a person present who spoke Spanish and that they were listening to him. "Malacon" instructed Nevarez to not sign paperwork, and that they would later provide documentation for the subject funds to the court. The interviewing agents asked if "Malacon" could simply explain the origin of the cash? "Malacon" responded that they did trading and oversaw taking funds from different investors to build properties and do trading. When agents asked "Malacon" for his name, "Malacon" immediately hung up and ended the call.

21.    These observations support that there is significant evidentiary value contained in the **Subject Phones**, as (1) Nevarez appeared to defer to "Malacon" as his superior and seek out his instructions, and a further review of their communications with one another could reveal the extent of Nevarez's illegal activities, and (2) the phone call conducted by Nevarez was also likely intended to alert his co-conspirator(s) that he had been interdicted by law enforcement.  I also believe that evidence critical to the investigation, such as where Nevarez traveled from in Los Angeles and where he picked up the cash is likely to be present in his phone, either in map/navigation applications or messages with his co-conspirators or "investors." I also believe, based on my training, experience, and knowledge of the investigation, that the **Subject Phones** are likely to contain evidence in the form of accounts, transaction histories, and additional information about the source of funds to be laundered.

22.    Based on my training and experience, and observations of the way the currency was packaged is consistent with methods used by money launders to smuggle bulk cash narcotics proceeds. Furthermore, a narcotics K-9 alerted to the currency which demonstrates that the money has been in contact with or cross contaminated by narcotics, supporting the contention that the cash is composed of narcotics proceeds.

23.    Lastly, Nevarez's statements are indicative that the subject funds are derived from criminal activity. Nevarez was unable to produce any documentation, either electronically or physically, that demonstrated the source of the subject funds. His

9

statements about the origin of the subjects' funds and what he planned to do when he arrived at his destination of the "In and Out" restaurant contained inconsistencies and falsehoods.

24. Based upon my training and experience, and consultations with law enforcement officers experienced in money laundering investigations and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data relevant to these cases. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone.

25. Based upon my experience and investigation in this case, I believe that Nevarez was involved in money laundering activities, and that Nevarez used the **Subject Phones** as an instrument to further his money laundering activities. Based upon my training and experience, consultation with other law enforcement officers experienced in money laundering investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to Nevarez's participation in money laundering, such as telephone numbers, navigation and location history, made and received calls, message communications, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Subject Phones.**

26. Finally, money laundering conspiracies require detailed and intricate planning to successfully evade detection by law enforcement. In my professional training and experience, this requires planning and coordination which takes weeks and months. The level of trust between parties which handle significant amounts of funds are often established over a long time between co-conspirators. For this reason, I respectfully request permission to search the **Subject Phones** for data from January 1, 2026, up to and including April 20, 2026.

10

**METHODOLOGY**

26.    It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini computers allowing for electronic mail services, web services, and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

27.    Following the issuance of this warrant, I will collect the subject cellular/mobile telephones and subject them to analysis. All forensic analysis of the data contained within the telephones and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

28.    Based on the foregoing, identifying and reviewing extracted data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting

11

the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

### CONCLUSION

29.    Based on all of the facts and circumstances described above, there is probable cause to conclude that Nevarez used the **Subject Phones** to facilitate violations of the target offenses.

30.    Because the **Subject Phones** were seized from Nevarez at the same time the currency was seized, and that the **Subject Phones** was securely stored thereafter, there is probable cause to believe that evidence of the previously mentioned illegal activities committed by Nevarez continues to exist on the **Subject Phones**.

31.    I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachments A-1 and A-2, and the seizure of items listed in Attachment B, using the methodology described above.


I swear the foregoing is true and correct to the best of my knowledge and belief.


*Travis Womack*
_____
Travis Womack
Task Force Officer
Federal Bureau of Investigation


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 28th day of April, 2026.


_____
The Honorable Michael S. Berg
United States Magistrate Judge

12